SCURLOCK, COMMISSIONER OF REVENUES *v.* HENDERSON.

5-339                                    268 S. W. 2d 619

Opinion delivered May 31, 1954.

[Rehearing denied June 28, 1954.]

O. T. Ward and Russell Reinmiller, for appellant.

Elsijane T. Roy and Reid & Roy, for appellee.

GRIFFIN SMITH, Chief Justice. The question for determination is whether tax exemptions provided by § 6(d) of Act 487 of 1949, Ark. Stat's, § 84-3106 (sup.) may be invoked in favor of one who purchases machinery for ginning cotton. The exemption extends to tangible personal property ". . . used by manufacturers or processors or distributors for further processing, compounding, or manufacturing; [also] tangible personal property used for repair, replacement, or expansion of existing manufacturing or processing facilities . . ."

In March, 1951, W. A. Henderson, Jr., purchased gin machinery from a Texas corporation to be used at Marvel, Arkansas. The Commissioner of Revenues asserted an obligation of $208.88, based on the price paid for the machinery. The Commissioner's position is that ginning cotton is not manufacturing or processing within the legislative intent.

We know as a matter of general information that when cotton is ginned, trash—including leaves and hulls —is removed, and that seeds are taken from the fiber. The hulls serve one commercial purpose, the seeds another, and the cotton as such becomes the principal commodity, ready for marketing and processing. But, says appellee, the raw material taken from the field has undergone a necessary transformation, without which its value would be impaired.

It must be conceded that "processing" is a flexible term and might with strictness be applied to any alteration of raw material, such as cutting trees for conversion into lumber, washing potatoes preliminary to placing them in sacks, husking and selling corn, thrashing wheat and similar grain, removing stems from strawberries, and the like.

Our conclusion is that cotton becomes a commercial commodity when it is ginned. Samples, taken either before or after ginning, enable buyers to grade quality and make price offerings—offerings that are controlled within narrow limits by domestic and world demand for the fiber after it has been placed on the ginner's platform, or compressed. It is then ready for processing or manufacturing.

The State relies largely upon *Georgia Warehouse Co.* v. *Jolley,* 172 Ga. 172, 157 S. E. 276, while the appellee thinks the principle enunciated in that case was traversed in *Moore* v. *Farmers Mutual Manufacturing & Ginning Company,* 51 Ariz. 378, 77 Pac. 2d 209. Another case which will be presently discussed is *Assessors of Boston* v. *Commissioners of Taxation et al.,* 323 Mass. 730, 84 N. E. 2d 129.

The Georgia case was decided in 1921. A constitutional amendment permitted the voters of a county or other political subdivision to determine at an election whether new manufactories or the enlargement of existing ones should be tax-exempt for a period of five years. Macon county adopted this policy and Jolley constructed a modern gin. The sheriff levied a tax execution for the year 1928 and Jolley sought an injunction. In affirming action of the trial court in refusing to enjoin, the Supreme Court said:

"Considering the meaning of the word 'manufacturing' in connection with our consideration of the meaning of 'processing', it must be plain that the word 'processing' has reference only to some stage or process of manufacturing. The generic meaning of the word 'cotton' as related to manufacturing has relation only to

cotton as a marketable product in the marts of commerce. The term 'cotton' is universally recognized as referring to something which can be manufactured so as to be of use to civilized man. So we are of the opinion that the word 'processing' means a process in manufacturing cotton after it has been put in a marketable form by ginning''.

None of our opinions has construed "processing" as utilized in Act 487. Dictionary definitions help but little, for it must be conceded that the term may relate to a broad range of transactions, one of which might have its inception in raw material only slightly altered in form, but constituting an indispensable step in continuous or progressive conversion into an article of commerce. Such an initial operation might, in some circumstances, be a part of the manufacturing process. Defining "definition" is equally difficult, for ". . . it is so closely connected with classification that, until the nature of the latter process is in some measure understood, [definition] cannot be discussed to much purpose". J. S. Mills, Logic, I. viii, § 1.

It is not our purpose here to lay down an inflexible rule applicable to § 6(d) of Act 487. Our conclusions must necessarily be restricted to the ginning of cotton.

Appellee thinks the correct result was reached by the Supreme Court of Arizona in Moore's case. The distinction—not stressed in either brief—lies in the fact that one who claims the benefit of an exemption must clearly establish the right. Our cases have gone far in holding that tax exemptions are never presumed. In *Brodie* v. *Fitzgerald,* 57 Ark. 445, 22 S. W. 29, Mr. Justice Hughes cited cases, also Desty on Taxation. He quoted with approval the statement that exemptions, no matter how meritorious, are acts of grace upon the part of the sovereign, and must be restrictively treated, [for] ". . . every reasonable intendment must be made that it was not the design to surrender the power of taxation, or to exempt any property from its due proportion of the burden of taxation".

The language just copied was quoted by Mr. Justice Mehaffy in *Wiseman* v. *Madison Cadillac Company*, 191 Ark. 1021, 88 S. W. 2d 1007. See 103 A. L. R., 1208. In the Wiseman case Judge Mehaffy cited Cooley on Taxation, Vol. 2 4th Ed., § 672, p. 1403. There the textwriter said: ". . . Exemptions are never presumed, the burden [resting] on a claimant to establish clearly his right to exemption, and an alleged grant of exemption will be strictly construed, and cannot be made out by inference or implication, but must be beyond reasonable doubt. In other words, since taxation is the rule and exemption the exception, the intention to make an exemption ought to be.expressed in clear and unambiguous terms; it cannot be taken to have been intended when the language of the statute on which it depends is doubtful or uncertain".

With this positive language as a guide, let us turn to the Arizona case appellee stresses and upon which he relies for logic in contradiction of the Georgia decision.

In Judge Lockwood's opinion there is the statement that the plaintiffs and defendants admitted that the defendants were under an obligation to pay a tax. The question was whether ginning cotton fell within the provisions of the statute's gross income provision on which the rate was one-fourth of one percent, or under the privilege sales tax provision exacting one percent. Judge Lockwood then said: "The parties also agree that the rule of law which is decisive of the case is that where there is in the same statute a particular enactment, and also a general one which, in its most comprehensive sense, would include the subject matter embraced in the particular one, the particular enactment is operative, and the general one must be taken to affect only such cases within its general language as are not included in the provisions of the particular enactment".

In a paragraph devoted to a comprehensive analysis of the two statutory sections, delightfully expressed and carefully reasoned, the opinion writer concluded that under the rule of construction agreed to by the litigants.

". . . the ginning of cotton, since it is undoubtedly an agricultural product, falls within the provisions of subsection (a) 1, rather than within the general provisions of subsection (g) as being 'any tangible personal property whatsoever' ".

Thus it will be seen that what the court actually did was to determine which of the two classifications the taxing authority intended should apply to ginning cotton, and since the particular enactment contained language thought by the court to meet the test of the rule of law agreed upon, the lower rate was approved.

In the controversy appealed by the Assessors of Boston, to which reference has been made, this distinction cannot be drawn. By the laws of Massachusetts machinery of manufacturing corporations was exempted from local taxation. Instead, there was imposed a corporation franchise tax. The board of assessors for Boston appealed twelve judgments, all having dealt with in a single opinion written by Mr. Justice RONAN for the Supreme Judicial Court. Merchants Wool Scouring Company, a Massachusetts corporation, would be exempt from local taxation if the nature of its business justified a judicial finding that it was a domestic manufacturing corporation.

The company's only business was that of processing raw and waste wool for the account of others at its plant in Boston.[1]

---

[1] The opinion contains this explanation: "If the wool when received is not in good condition for scouring because it contains a slightly excessive amount of foreign matter, it is fed into a dusting machine; or if it is matted it is put into a breaker machine; or if heavily matted it is put into a machine known as the tag breaker. Wool containing burrs is treated by a burr picking machine, and if the wool is not then relatively free from burrs it is carbonized by submerging it into a solution of sulphuric acid. When the wool is ready for scouring, it is put upon a conveyor belt, studded with pine, which catches the wool and raises it upward while it is combed out and evened off by a toothed rake, and it is finally deposited in a vat in which it is submerged in hot water to which a chemical solution is added and where it is agitated by a series of rakes. The wool is removed from this vat and the water squeezed out, and it is again submerged in a second vat in a solution of water and another chemical compound. It is then removed and treated in a similar manner in a third vat. It is finally conveyed to a fourth vat known as the rinsing or bleaching vat where it is again submerged in water to which a bleaching solution is added if the customer desires the wool to have a certain color. The wool is removed from this vat,

In analyzing the case Judge RONAN said that the statute should be fairly construed "to effectuate, if reasonably possible, the legislative intent and purpose. The words 'engaged in manufacturing' are not to be given a narrow or restricted meaning."

It has been said that the construction touching manufacturing, processing, and commodities peculiar to a particular geographical district is necessarily influenced by local or area activities and necessities. The Supreme Judicial Court of Massachusetts is in a much better position than we to determine what the lawmaking authority had in mind when for the purpose of inviting manufactories into the state, or encouraging non-resident or domestic organizations to build plants, exemptions were provided.

The "feel" of legislative intent necessarily has a relation to local commerce, industry, and activities; and it inevitably blends with what courts know to be true in kinship with judicial notice.

Strictly speaking, any change or alteration in a commodity is a process; but "processing," as utilized in the exemption Act, must have been selected as a word having some direct bearing upon manufacturing.

We agree with the Georgia court that ginning is not processing or manufacturing, and that the Commissioner was correct in making the assessment. It follows that the judgment must be reversed.

Justices McFADDIN, MILLWEE and ROBINSON dissent.

MINOR W. MILLWEE, Justice, dissenting. The majority opinion takes as its touchstone rule of construction the axiom that tax exemptions are never presumed, and that a grant of an exemption must be made out beyond a reasonable doubt. This is undoubtedly true, but, while exemption clauses are to be construed most strongly against the taxpayer, they are not to be so strictly con-

---

dried, bagged, and shipped to the customer, and it is ready for carding and spinning into thread, cloth, or rugs. The different processes to which the wool has been subjected are essential steps in the changing of raw wool before it can be made up into cloth."

strued as to defeat or destroy the intent and purpose of the enactment, and no strained construction will be given them that will effect that end. *State* v. *Wertheimer Bag Co.*, 253 Ala. 124, 127, 43 So. 2d 824. It has been said that "If the act expresses the intent to exempt certain property, judicial construction is not appropriate to defeat the exemption." In re Bendheim's Estate, 100 Cal. App. 2d 398, 223 P. 2d 874. The ultimate consideration in all cases of statutory interpretation is the intention of the legislature, and this intention must primarily be determined from the language of the statute itself. *McKinley, Commissioner of Labor*, v. *R. L. Payne & Son Lumber Company*, 200 Ark. 1114, 143 S. W. 2d 38.

The majority opinion relies strongly upon the much cited case of *Georgia Warehouse Co.* v. *Jolley*, 172 Ga. 172, 157 S. E. 276, in which the court said: "The term 'cotton' is universally recognized as referring to something which can be manufactured so as to be of use to a civilized man. So we are of the opinion the word 'processing' means a process in manufacturing cotton after it has been put in a marketable form by ginning, which is merely the separation of the cotton from its seed, and seed cotton is not referred to in the constitutional amendment." It is difficult to see how the Georgia court can thus arbitrarily draw a line in the chain of evolution from the boll to the bolt of cloth by saying that before a certain point the cotton is only being prepared to be processed rather than undergoing a processing. Perhaps the reasoning of the case can be explained by the court's express statement that the purpose of the Constitutional amendment under consideration in that case was to encourage manufacturing; the opinion considers the word "processing" in the light of "manufacturing" rather than ascribing to it any meaning of its own. In this case, appellee argues that the word "or" separating "manufacturing" and "processing" gives each word meaning uncolored by the connotations of the other. But even accepting the rationale of the Georgia Warehouse case, still it seems undeniable that "processing" is a far less inclusive

term and need not embrace near the scope of activity of "manufacturing", and the Georgia court's holding, in effect, that the terms are synonymous seems strained indeed.

The problem of the construction of this statute is a difficult one, for as is said in *Kennedy* v. *State Board of Assessment and Review,* 224 Ia. 405, 276 N. W. 25: "Technically speaking any change, chemical or otherwise is a process . . .", and almost certainly the legislature did not intend to exempt from taxation every facility in the steps from seed to end product. Under such a theory, ridiculous results could be reached, for water, fertilizer, farm implements, etc., all play a part in the early development of crops which are eventually used by manufacturers and processors. In the Kennedy case, supra, the court recognizes this problem, and goes on to say: " . . . but I do not believe the legislature intended so strained a construction as to call the developing of crops by means of fertilizer a processing. . . The growing of the article is not in the common use of the term a processing, but some change in the article after it is grown by means of special treatment is a processing." This would seem a much more logical place to draw the line than that set forth in the Georgia Warehouse case, supra.

In *Assessors of Boston* v. *Commissioner of Corporations and Taxation et al.,* 323 Mass. 730, 747, 84 N. E. 2d 129, cited in the majority opinion, in discussing a wool scouring company's nature as a manufactory, the court said: "If the scouring were done by a textile manufacturer in his own factory, it would be difficult to say that those employed in the scouring department were not engaged in manufacturing. If the manufacturer let the work in that department out to an independent contractor to be performed in the manufacturer's factory, the insurer of the manufacturer could not avoid the payment of workmen's compensation to an employee of the independent contractor injured while performing a part of or a process in the trade or business of the manufacturer. In other words, the

scouring of the wool is an essential and integral part of the manufacturing of textiles. The scouring does more than merely remove foreign matter from the wool. It removes a portion of the natural elements contained in the fibers. To say that manufacturing does not start until after the wool has been scoured does not seem to be a realistic view of the situation. It would be more accurate to say that scouring is the first step in transforming the wool into a new finished product. We think manufacturing begins with the scouring.''

The rationale of this case might very well be applied to cotton ginning in holding that it is manufacturing, for there were experts who testified that the cotton cannot be used for manufacturing until it has been ginned, and certainly ginning ''removes a portion of the natural elements contained in the fibers.'' But our statute would not seem to necessitate that this court go that far in order to uphold the award to appellee, for even viewing ''processing'' in the light of ''manufacturing'', still the terms are not synonymous; indeed, to hold them so would be to render ''processing'' a meaningless redundancy. To the contrary, our exemption would seem to be satisfied with something less than manufacturing; what this ''something less'' is, is the only remaining problem for consideration.

It would seem to the writer that a common sense point of distinction between ''manufacturing'' and ''processing'', viewing the latter in the light of the former, is that manufacturing is composed of various processes, but that other operations are composed of processes also, and that the legislature intended to exempt the activity which is a process in manufacture and not to exempt the processes in other forms of operation.

Under this construction, cotton ginning is clearly a process in manufacturing. In this connection it would naturally be supposed that the members of the industry would have a fair notion as to what they were engaged in. As stated previously, expert witnesses testified that cotton can only be used for manufacturing after

ginning. Appellee introduced into evidence many trade journals, bulletins and pamphlets dealing with cotton culture which show that the words "process" and "processing" are commonly used in reference to the ginning of cotton by cotton men. Indeed, it is difficult for anyone to discuss the activity under consideration without the repeated use of these words. Thus the intention of the legislature, determined from a reasonable interpretation of the words of the exempting statute, would seem to be to exempt from taxation machinery used in cotton ginning. Such was the interpretation placed on the statute by the appellant until the instant controversy arose. Of course, the wisdom of the exemption was a matter for the Legislature—and not this court.

In the final paragraph of the opinion, the majority hold that "ginning is not processing or manufacturing", leaving this writer to speculate as to just what ginning possibly could be and also what processing and manufacturing are. From this holding, I respectfully dissent.

Justices McFADDIN and ROBINSON join in this dissent.