IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**9W HALO OPCO, LP,**
*Plaintiff/Appellant,*

*v.*

**ARIZONA DEPARTMENT OF REVENUE,**
*Defendant/Appellee.*

No. CV-24-0288-PR
Filed March 3, 2026

Appeal from the Arizona Tax Court,
The Honorable Erik Thorson,[1] Judge
No. TX2020-000967
**REVERSED AND REMANDED**

Memorandum Decision of the Court of Appeals
Division One
No. 1 CA-TX-23-0003
Filed November 7, 2024
**VACATED**

COUNSEL:

Dawn R. Gabel, Ryan Legal Services, PLLC, Scottsdale; Bennett Evan Cooper (argued), Alexandra Crandall, Dickinson Wright PLLC, Phoenix, Attorneys for 9W Halo OPCO, LP

Kristin K. Mayes, Arizona Attorney General, Clinten N. Garrett (argued), Benjamin H. Updike, Syreeta Tyrell, Assistant Attorneys General, Phoenix, Attorneys for Arizona Department of Revenue

Julie M. Kriegh, City Attorney, Office of the City Attorney, John C. Shafer, III (argued), Assistant City Attorney, Karen Stillwell, Assistant Chief

---

[1]    The name of the Judge has been changed pursuant to Maricopa County Superior Court Order Changing Name of Adult issued December 2, 2024.

Counsel, Phoenix, Attorneys for City of Phoenix

Nancy L. Davidson, League of Arizona Cities and Towns, Phoenix, Attorney for Amicus Curiae League of Arizona Cities and Towns

---

VICE CHIEF JUSTICE LOPEZ authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER and JUSTICES BOLICK, BEENE, MONTGOMERY, KING and CRUZ joined.

---

VICE CHIEF JUSTICE LOPEZ, Opinion of the Court:

¶1        A.R.S. § 42-5159(B)(1) exempts from taxation "[m]achinery, or equipment, used directly in manufacturing, processing, fabricating, job printing, refining or metallurgical operations."  We consider the meaning of "processing operations" in this tangible personal property use tax exemption statute.  We hold that the "processing operations" use exemption applies to machinery or equipment that a taxed entity uses to change the marketability of a product.  Here, because the industrial healthcare textile laundry facility changes the marketability of the textiles it markets, it qualifies for the § 42-5159(B)(1) use exemption as a "processing operation."

¶2        We also consider whether the downstream transactions of a taxpayer's business—whether it sells or rents a product—are relevant to the taxpayer's eligibility for § 42-5159(B)(1)'s use exemption as a "processing operation."  We hold that downstream transactions are irrelevant to the "processing operation" inquiry, which only examines distinct operations within the entire business.

## BACKGROUND

¶3        Plaintiff-Appellant, 9W Halo OPCO, LP, d/b/a Angelica Textile Services, LP ("Angelica"), rents reusable healthcare textiles—such as bedsheets, patient gowns, and surgical scrubs— to hospitals, outpatient facilities, and long-term care centers in Arizona.  Angelica's facility processes 30 million pounds of healthcare textiles a year.  Used healthcare

textiles are routinely contaminated with viruses and bacteria, such as E. coli, and cannot be re-used in patient care unless they are specially laundered and sterilized. Angelica cannot even offer new textiles to healthcare facilities for use before processing them because it must remove any bacteria introduced during the manufacturing process. Angelica's operation is subject to federal and local regulations concerning healthcare textiles.

¶4 Angelica uses a variety of washing and drying equipment to clean and disinfect the textiles. After a pre-wash, the textiles undergo a twelve-module cleaning cycle, which requires injection of up to eight different chemicals in precise amounts that vary by textile type. The application of chemicals during the cleaning process changes the composition of the textiles by removing all potential contaminants from the textile fibers.

¶5 From 2014 to 2018, Angelica purchased equipment and chemicals to use in its textile laundering and disinfecting process and remitted State and City of Phoenix ("City") use taxes for these purchases. In 2018, Angelica submitted claims for use tax refunds based, in part, on § 42-5159(B)(1) and Phoenix City Code §§ 14-110(a)(1) and 14-660(g). After initially denying Angelica's refund claim, Defendant-Appellee, the Arizona Department of Revenue ("Department"), revised its assessment in 2020 and denied roughly half of the requested refund.[2] Angelica appealed the Department's decision to the Arizona Tax Court and subsequently moved for summary judgment.

¶6 In its tax-court motion, Angelica argued that the purchased laundry equipment qualified for a use tax exemption because it is used in a "processing operation" under § 42-5159(B)(1). The Department, joined by the City, cross-motioned for summary judgment, alleging that Angelica's "linen rental business" did not qualify as a tax-exempt "processing

---

[2] The Department also denied part of Angelica's claim under P.C.C. §§ 14-110(a)(1), -660(g). Although the City Code uses the term "income-producing capital equipment," the sections adopt a use tax exemption identical to § 42-5159(B)(1). *Compare* P.C.C. §§ 14-110(a)(1), -660(g) *with* A.R.S. § 42-5159(B)(1). Both the tax court and the court of appeals focused solely on the application of § 42-5159(B)(1), the issue currently before this Court.

operation" because Angelica does not change raw materials into finished products. The tax court upheld the Department's decision and granted it summary judgment. In its ruling, the tax court reasoned that it "must look at Angelica's business as a whole" to determine whether it qualified for the use tax exemption under § 42-5159(B)(1). Angelica appealed the tax court's decision.

¶7 The court of appeals affirmed the tax court's ruling, reasoning that the commonly understood meaning of "processing" is the "preparation for market" or "to convert [a product] into marketable form." *9W Halo OPCO, LP v. Ariz. Dep't of Revenue*, No. 1 CA-TX 23-0003, 2024 WL 4702300, at *4 ¶ 23 (Ariz. App. Nov. 7, 2024) (mem. decision). The court found that Angelica's business model—namely, renting healthcare textiles and repeatedly processing the same articles for rental—did not satisfy the court's definition of "processing." *Id.* at *5 ¶¶ 26–28.

¶8 Angelica petitioned this Court for review. We granted review to resolve a recurring issue of statewide importance: how § 42-5159(B)(1)'s use tax exemption for "processing operations" applies to businesses in Arizona. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

**DISCUSSION**

¶9 Summary judgment is appropriate if there are no genuine issues of material fact, and one party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(a). "[W]e review a grant of summary judgment de novo," viewing the facts in a light most favorable to the party against whom judgment was granted. *Dabush v. Seacret Direct LLC*, 250 Ariz. 264, 267 ¶ 10 (2021).

¶10 The parties do not dispute the material facts concerning the technical operation of Angelica's business. Instead, they dispute whether § 42-5159(B)(1)'s use exemption applies to Angelica's operation. We review questions of statutory interpretation de novo. *Planned Parenthood Ariz., Inc. v. Mayes*, 257 Ariz. 137, 142 ¶ 13 (2024).

4

## I.

**¶11**    We must resolve the parties' dispute over two threshold statutory interpretative issues before we define "processing" under § 42-5159(B)(1): whether the court of appeals erred by (1) adopting the "commonly understood meaning" of "processing" in 1989, and (2) invoking the doctrine of legislative acquiescence. *9W Halo*, 2024 WL 4702300, at *4 ¶¶ 22–23.

## A.

**¶12**    The court of appeals moored its interpretation of § 42-5159(B)(1) to *Meredith Corp. v. State Tax Comm'n*, 23 Ariz. App. 152, 153 (1975), which held that courts must apply the statute in a manner "consistent with the ordinary man's understanding of what constitutes a 'processing operation', rather than a scientific or technical interpretation." *See 9W Halo*, 2024 WL 4702300, at *4 ¶ 22. Notably, the court's interpretation mirrors the Legislature's directive that "processing" and similar terms in the statute "refer[] to and include[] those operations *commonly understood* within their *ordinary meaning*." § 42-5159(B)(1) (emphasis added); *9W Halo*, 2024 WL 4702300, at *4 ¶ 20.

**¶13**    Angelica, undeterred by this, contends that *State ex rel. Ariz. Dep't of Revenue v. Capitol Castings, Inc.*, 207 Ariz. 445 (2004), requires courts to interpret the use exemption statute using flexible and industry-specific definitions. In *Capital Castings*, this Court considered whether § 42-5159(B)(1) applied to particular equipment used to manufacture grinding balls for the mining industry. 207 Ariz. at 446 ¶¶ 1–2. We instructed courts to "apply flexible and commonly used definitions of *machinery and equipment* within the relevant industry." *Id*. at 450 ¶ 24 (emphasis added). But the "flexible" and "industry" qualifiers from *Capital Castings* only apply when defining *machinery* and *equipment*. By contrast, the statute expressly commands that "processing" be defined as it is commonly understood within its ordinary meaning. § 42-5159(B)(1) ("The term[] . . . 'processing' . . . as used in this paragraph refer[s] to and include[s] those operations commonly understood within their ordinary meaning.").

**¶14**    The court of appeals correctly followed the Legislature's instruction to use the "ordinary meaning" of "processing." This approach

also aligns with this Court's directive that, in tax cases, it is important to "gain the[] fair meaning" of the statute's words to avoid gathering "new objects of taxation by strained construction or implication." *Ariz. State Tax Comm'n v. Staggs Realty Corp.*, 85 Ariz. 294, 297 (1959).

**B.**

**¶15**        Angelica also argues that the court of appeals misapplied the "legislative acquiescence" doctrine.  The doctrine's main principle is that "the legislature, when it passes a statute, knows the existing laws." *Daou v. Harris*, 139 Ariz. 353, 357 (1984).  But the application of the doctrine is limited to "instances in which the [L]egislature has considered and declined to reject the relevant judicial interpretation." *Delgado v. Manor Care of Tucson AZ, LLC*, 242 Ariz. 309, 314 ¶ 24 (2017) (internal quotations omitted) (quoting *Sw. Paint & Varnish Co. v. Ariz. Dep't of Env't Quality*, 194 Ariz. 22, 25 ¶ 21 (1999)).  The doctrine applies only "where a statute which has been construed by a court of last resort is reenacted in the same or substantially the same terms." *Madrigal v. Indus. Comm'n*, 69 Ariz. 138, 144 (1949); *see also Calvert v. Farmers Ins. Co. of Ariz.*, 144 Ariz. 291, 297 (1985) (noting that the Arizona Supreme Court is the court of last resort in the state).

**¶16**        Angelica claims that the court of appeals misapplied the legislative acquiescence doctrine by observing that "the [L]egislature is aware of the state of the law when it adopts or amends a statute," immediately after citing *G.B Inv. Co. v. Ariz. Dept. of Revenue*, No. 629-88-S (Ariz. Bd. of Tax App. June 20, 1989), to determine the meaning of "processing" at the time § 42-5159's precursor was adopted.  *9W Halo*, 2024 WL 4702300, at *3–4 ¶¶ 19–21.  We disagree.  Although the doctrine of legislative acquiescence is inapplicable here because the Arizona Board of Tax Appeals is not the court of last resort, we are not convinced that the court of appeals' passing reference to the Legislature ever invoked the doctrine at all.

**II.**

**¶17**        Having resolved the preliminary interpretive issues, we turn to the parties' first primary dispute—the meaning of "processing operation" under § 42-5159(B)(1).

**A.**

**¶18**        "When interpreting statutes, we begin with the text." *Franklin v. CSAA Gen. Ins. Co.*, 255 Ariz. 409, 411 ¶ 8 (2023).  The best indication of legislative intent is a statute's plain language, which, when clear, "we apply [] unless an absurd or unconstitutional result would follow."  *Premier Physicians Grp., PLLC v. Navarro*, 240 Ariz. 193, 195 ¶ 9 (2016).  If the text is "reasonably susceptible to differing interpretations," it is ambiguous, and this Court turns to "secondary factors, such as the statute's context, subject matter, historical background, effects and consequences, and spirit and purpose."  *Id.*

**¶19**        We strictly construe tax exemption statutes and presume against exemptions.  *Tucson Transit Auth., Inc. v. Nelson*, 107 Ariz. 246, 252 (1971).  However, tax exemptions "should not be so strictly construed as to defeat or destroy the legislative intent and purpose."  *Capitol Castings, Inc.*, 207 Ariz. at 447 ¶ 10 (citation modified).  With these principles in mind, we turn to the statute.

**¶20**        Section 42-5159(B)(1) provides a tangible personal property use tax exemption for:

> Machinery, or equipment, used directly in manufacturing, processing, fabricating, job printing, refining or metallurgical operations. The terms "manufacturing", "processing", "fabricating", "job printing", "refining" and "metallurgical" as used in this paragraph refer to and include those operations commonly understood within their ordinary meaning.

Section 42–5159(B)(1)'s purpose is "to stimulate business investment in Arizona in order to improve the state's economy and increase revenue from other taxes, such as income and property taxes."  *Capitol Castings, Inc.*, 207 Ariz. at 448 ¶ 13.

**¶21**        Before § 42–5159(B)(1)'s enactment, in *Moore v. Farmers Mut. Mfg. & Ginning Co.*, we defined "processing" as "to subject (especially raw material) to a process of manufacturing, development, preparation for the market, etc[.]; to convert into marketable form."  51 Ariz. 378, 382 (1938) (quoting Webster's New International Dictionary) (internal quotations

7

omitted). Here, the court of appeals adopted *Moore*'s definition. *9W Halo*, 2024 WL 4702300, at *4 ¶ 24. The Department contends that *Moore* renders raw material a requirement of any "processing operation." We are unpersuaded. When adopting its "processing" definition, *Moore* clarified that it was the one that "obviously applies to an operation like the ginning of cotton"—a raw material—the "processing" at issue in the case. *Moore*, 51 Ariz. at 382. We do not interpret *Moore* to require raw material as an element of "processing" under the statute.

¶22 Furthermore, *Moore* interpreted different statutes, as applied to cotton ginning, and its definition's parenthetical reference to "especially raw material" does not exclude processing of other material.[3] To be sure, *Moore* provides relevant context for the historical meaning of "processing." But we are unconvinced that the Legislature intended to limit "processing" to raw materials when it enacted § 42–5159(B)(1) nearly thirty years later.

**B.**

¶23 If a statute does not define a term, we "may consider dictionaries and written publications to discern the word's common meaning and usage, respectively, at the time the legislature enacted the statute." *Garibay v. Johnson*, 259 Ariz. 248, 255 ¶ 24 (2025). Here, as noted, the Legislature clarified that "processing" refers to "those *operations* commonly understood within their *ordinary meaning*." *See* § 42-5159(B)(1) (emphasis added). Thus, the statute expressly requires that "operation" and "processing" be read together as "processing operation." Accordingly, we turn to dictionary definitions to determine the common and ordinary

---

[3] "Especial" means "not general" and "distinguished among others of the same class as exceptional in degree." *Especial*, Webster's Collegiate Dictionary (5th ed. 1936) (a dictionary based on Webster's New International Dictionary, the reference cited in *Moore* for the definition of "process"). As used in *Moore*, "especially" means "in reference to one person or thing in particular" as distinguished from others. *Especially*, Webster's Universal Dictionary of the English Language (1937). While synonymous with words like "particularly" and "mainly," the term "especially" does not mean "exclusively." *See id.*; *Especial*, Webster's Collegiate Dictionary (5th ed. 1936) (synonyms include "peculiar" and "uncommon").

meaning of a "processing operation," *see Garibay*, 259 Ariz. at 255 ¶ 24, before examining our relevant jurisprudence.

**1.**

**¶24** We begin by surveying dictionary definitions. The Legislature first enacted the precursor to § 42-5159(B)(1) in 1967 and reenacted the statute in its current form in 1989. *Compare* 1967 Ariz. Sess. Laws, ch. 2, § 3 (3d Special Session) *with* 1989 Ariz. Sess. Laws, ch. 132, § 35. Accordingly, we consider definitions from 1967 and 1989, as well as the intervening period.

**¶25** Standard dictionary definitions of "process" included "a series of actions or operations conducing to an end" in 1967, and "a systematic series of actions directed to some end" in 1989. *Process*, Webster's Seventh New Collegiate Dictionary (1967); *Process*, Webster's Encyclopedic Unabridged Dictionary of the English Language (1989). In 1989, "process" was also described as "a series of progressive and interdependent steps by which an end is obtained." *Process*, Webster's Encyclopedic Unabridged Dictionary of the English Language (1989). Ultimately, the standard dictionary definitions emphasize "a series of actions" directed to an end.

**¶26** The relevant legal definitions of "process" are consistent with this finding. In 1967, Black's Law defined "process" as "a series of actions, motions or occurrences; progressive act or transaction; continuous operation; method, mode or operation, whereby a result or effect is produced; . . . a chemical process . . . ." *Process*, Black's Law Dictionary (4th ed. 1968) (the 4th edition was revised in 1968 and current in 1967). By 1989, Black's Law had expanded the definition of "process" to include a "means to prepare for market or to convert into marketable form." *Process*, Black's Law Dictionary (5th ed. 1979) (citing *Emp. Sec. Comm'n of Ariz. v. Bruce Church, Inc.*, 109 Ariz. 183 (1973)). Both Black's Law definitions include the phrases "a series of actions" and a "method, mode or operation, whereby a result . . . is produced." *Compare Process*, Black's Law Dictionary (4th ed. 1968) *with Process*, Black's Law Dictionary (5th ed. 1979).

**2.**

**¶27**        We next consider our jurisprudence defining "processing." This Court first defined "processing" in 1938 in *Moore*. The *Moore* definition adopted a meaning similar to the dictionary definitions, including "preparation for the market" and "convert into marketable form." *Moore*, 51 Ariz. at 382. Thirty-five years after *Moore*, we considered the term "processing" in a different statute and noted, consistent with standard dictionary and Black's Law definitions, that "a process has been defined as a mode, method or operation, whereby a result is produced." *Bruce Church, Inc.*, 109 Ariz. at 186. In *Bruce Church*, we also observed that "process" had "been defined as to prepare for market or to convert into marketable form." *Id.* In fact, Black's Law cited *Bruce Church* for one definition of "process" in its fifth edition—the edition in effect in 1989. *See Process*, Black's Law Dictionary (5th ed. 1979).

**¶28**        In 1977, the court of appeals expanded the interpretive focus under the statutory precursor to § 42-5159(B)(1) to "include those items which are essential to [the exempt] operation and which make it an integrated system." *Duval Sierrita Corp. v. Ariz. Dep't of Revenue*, 116 Ariz. 200, 206 (App. 1977). *Duval Sierrita*'s "integrated system" concept establishes a baseline for defining the scope of the exempt "operation" under § 42-5159(B)(1).

**¶29**        To delineate the parameters of a qualifying processing operation's integrated system, we turn to our jurisprudence. In *Moore*, we held that cotton ginning was "processing" because it was a required step to "prepar[e] [the product] for the market." *Moore*, 51 Ariz. at 383. Thus, *Moore* instructs that a "processing operation" is a necessary component of product development. *See id.*; *see also Alsco, Inc. v. Tennessee Dep't of Revenue*, No. M2022-01019-COA-R3-CV, 2023 WL 5737452, at *9 (Tenn. Ct. App. Sept. 6, 2023) (holding that an industrial-laundry sanitization process qualified for a use tax exemption because it "result[s] in the textiles undergoing a change in state or form" from soiled to sanitized). *Capital Castings* is in accord. In that case, we opined that the inquiry into whether machinery is used directly in processing operations must include whether equipment touched, manipulated, affected, or added value to raw material or a work in process. 207 Ariz. at 451 ¶ 25. Moreover, we clarified that equipment used in post-production activities did not fall within the scope of a processing operation. *See id.* Thus, the use tax exemption hinges on

whether the machinery or equipment was integral to the transformation of a product. *See Moore*, 51 Ariz. at 382 (providing, as an example of processing, the "sorting and repacking" of fruits and vegetables); *Bruce Church*, 109 Ariz. at 187 (noting that "[c]ooling of a perishable product" constitutes "preparation for market," a key component of processing).

## C.

**¶30**      We can synthesize the relevant dictionary definitions of "processing" and "operation" and our jurisprudence interpreting § 42-5159(B)(1), its predecessor, and similar statutes into a single, operative definition that reflects the commonly understood and ordinary meaning of these statutory terms. A "processing operation" under § 42-5159(B)(1) is "a series of integrated actions or methods that prepares a product for the market or converts a product into marketable form." *See Moore*, 51 Ariz. at 382; *Process*, Black's Law Dictionary (5th ed. 1979); *Bruce Church*, 109 Ariz. at 186; *see also Ariz. Dep't of Revenue v. Sonee Heat Treating Corp.*, 178 Ariz. 278, 279 (Tax Ct. 1994) ("Processing means a series of actions or operations conducing to an end . . . ." (internal quotations omitted)). "Series of integrated actions or methods" defines the "operation," while "prepares a product for the market or converts a product into marketable form" defines "processing."

**¶31**      This definition is faithful to the Legislature's directive to utilize the ordinary meaning of "processing operation," synthesizes relevant dictionary definitions and our jurisprudence interpreting the term, and adheres to the "common understanding" of the statute. Moreover, the definition aligns with the Legislature's purpose to prioritize the application of the use tax exemption to industries and entities that contribute to the market and the state economy. *See Capitol Castings, Inc.*, 207 Ariz. at 448 ¶ 13 ("Our interpretation of the statute therefore should further, not frustrate, the policy of encouraging investment and spurring economic development.").

## III.

**¶32**      We now consider the parties' second primary dispute—whether Angelica qualifies for the use tax exemption as a "processing operation" under § 42-5159(B)(1).

**A.**

¶33        We first address whether § 42-5159(B)(1) requires or permits consideration of a business's downstream transactions.  The court of appeals gave dispositive, disqualifying force to Angelica's business model of renting healthcare textiles to its customers and retrieving and reprocessing them for future rental.  *9W Halo*, 2024 WL 4702300, at *5 ¶¶ 26–29.  Indeed, the court described Angelica as a mere "laundry." *Id.* ¶ 29.  The court reasoned that "preparation for market" does not include renting a product to customers for later retrieval and reprocessing. *Id.* ¶ 28. We disagree.  The exemption statute does not contemplate, let alone require, that a taxpayer's downstream business transactions involve the sale of a product to qualify as a "processing operation."  Thus, the court of appeals' reasoning is unsupported by the statute's text.

**B.**

¶34        We next consider whether § 42-5159(B)(1)'s use tax exemption is based on a business's entire "operation."  The Department argues that "operation" refers to an entire business.  In support, the Department contends that § 42-5159(G)(1)(b), which defines "manufacturing" as "the performance *as a business* of an integrated series of operations," evidences the fungibility of the terms "operation" and "business" within the statutory scheme.  § 42-5159(G)(1)(b) (emphasis added).  We are unpersuaded.  Even if "business" and "operation" may be used interchangeably in other contexts, they are not synonymous under § 42-5159(B)(1).    The Department's argument to the contrary fails for two reasons.  First, the (G)(1)(b) definition is limited to paragraph (G)(1).  *See* § 42-5159(G)(1) ("For the purposes of *this paragraph*: '[m]anufacturing' means . . . ." (emphasis added)).  Second, (G)(1) addresses a tax exemption for "the purchase price of electricity, natural gas or liquefied petroleum gas by: [a] qualified manufacturing or smelting *business*."  *See id.* (emphasis added).  In other words, the (G)(1)(b) definition the Department invokes expressly applies to a manufacturing or smelting *business* rather than an *operation* and creates a different, inapplicable tax exemption.

¶35        Our conclusion that "business" and "operation" are not perfect synonyms in the use tax scheme is not novel.  In *Bruce Church*, we implicitly acknowledged that "operation" is not necessarily synonymous with "business" when we observed that "[c]ooling of a perishable

product . . . [and] sizing [and] sorting, etc. [] all [are] operations." 109 Ariz. at 187. By deeming each discrete step an "operation," *Bruce Church* supports our conclusion that the term "operation" is, in some instances, narrower than "business" and may describe a single process within a business.

¶36 This interpretation of "operation" also aligns with relevant court of appeals opinions interpreting the use exemption statute. *See, e.g.*, *Duval Sierrita*, 116 Ariz. at 206 (explaining that the "boundaries of the exempt operation must be drawn taking into consideration the *entire operation* as it is '*commonly understood*' . . . ." (emphasis added)). The reference to the "entire operation" in *Duval Sierrita* was to conveyors, pipelines, and pumps that were "used directly" in mining and metallurgical operations. *Id.* at 205. Thus, "entire operation" was narrowly construed to include each *individual* operation, not the taxpayer's *entire business* operation. *See id.* at 206 ("The statute only exempts certain operations and obviously these operations have a beginning and an end. For example, the mining company which mines its ore in Arizona and ships that ore by rail to Texas for smelting has completed the mining operation when the ore is loaded and the smelting company has not begun its metallurgical operation until that ore arrives in Texas.").

¶37 Courts have misconstrued *Duval Sierrita*'s "entire operation" phrase, resulting in jurisprudential misadventure in interpreting and applying § 42-5159(B)(1) and its predecessor. In *Duval Sierrita*'s wake, the court of appeals in *Meredith* pronounced that, in determining whether the use tax exemption applied, "the question to be resolved is not whether the equipment processes, but whether the recording, storage and later the transmission of a television signal through the use of the equipment is a 'processing operation.'" 23 Ariz. App. at 153. Concluding the exemption did not apply, the court reasoned that "the ordinary man would think of cotton or food as being processed and automobiles or toys as being manufactured . . . [but] he would think of a television picture as being *broadcast* and electricity as being generated." *Id.* (emphasis added). Thus, *Meredith* expanded the "entire operation" concept to include the common man's understanding of both the end product and the business as a whole.

¶38 On *Meredith*'s heels, the court of appeals in *Ariz. Dep't of Revenue v. Blue Line Distrib., Inc.* held that "the [use] exemption depends on *whether a [] business* is commonly understood to be a manufacturing or

processing operation." 202 Ariz. 266, 267 ¶ 9 (App. 2002) (emphasis added). *Blue Line* reasoned that "manufacturing operation" and "processing operation" generally "refer [] to *such businesses* as commercial glassworks, sausage makers, grain mills, leather goods factories, slaughterhouses, tanneries, and the like." *Id.* at 268 ¶ 10 (emphasis added). *Blue Line* effectively cabined the "processing operation" use exemption to a taxpayer's entire *business* operation—an interpretation inconsistent with the structure and text of the use exemption statute. For this reason, we disavow *Blue Line*. We also reject *Meredith*'s analysis to the extent it suggests courts should analyze an entire business operation, rather than the singular operations within a business.

¶39 The statutory text prescribes a narrow focus on individual operations, rather than the transactions or nature of a business as a whole. Section 42-5159 exempts only "machinery" or "equipment" that is "*used directly in* . . . processing . . . operations.*" (Emphasis added.) The statute asks what *operation* the equipment is used *in*, rather than the type of business *for* which the equipment is used.

¶40 An example illustrates this point. Section 42-5159(B)(1) provides a use tax exemption for "'[m]etallurgical operations' [which] include[] leaching, milling, precipitating, smelting and refining." Section 42-5159(B)(2) provides a use tax exemption for machinery or equipment used directly in mining. A business could engage in one or more of these activities. *Duval Sierrita* observed that a mining company which mines and ships ore completes the mining operation upon shipment, while a smelting company does not begin its metallurgical operation until it receives the ore. 116 Ariz. at 206. In that scenario, each activity would qualify for the use exemption under the statute. But what if a single company, say a jeweler, purchased the mining and smelting operations? Would each operation still qualify for the use tax exemption, or would the company be precluded from exemptions based on the characterization of its entire business as a jeweler? Of course, the answer is that the business would be entitled to use exemptions for both mining and smelting because the exemption is based on individual *operations*, rather than the classification of the business as a whole.

**C.**

**¶41**        Having defined a "processing operation" under § 42-5159(B)(1) as "a series of integrated actions or methods that prepares a product for the market or converts a product into marketable form," we must establish a framework for determining whether a processing operation qualifies for the use tax exemption.   To that end, we devise a two-step inquiry, which asks whether: (1) an operation prepares a product for the market or converts it into marketable form, and (2) the operation uses machinery or equipment in a series of integrated actions or methods during the preparation of the product.  If both questions are answered in the affirmative, the operation constitutes "processing" and qualifies for a use tax exemption under the statute.   However, only machinery or equipment that touches, manipulates, affects, or adds value to a product qualifies for the exemption. *See Capitol Castings, Inc.*, 207 Ariz. at 451 ¶ 25.

**D.**

**¶42**        Angelica qualifies as a "processing operation" under § 42-5159(B)(1) because its textile laundering and disinfecting process involves a series of integrated actions or methods that prepares a product for the market or converts a product into marketable form.   First, the products in Angelica's operation—healthcare textiles, new or used—are not marketable for their intended use prior to the laundering and disinfecting process.  The fact that the textiles Angelica acquires may be marketable for some other purpose before it processes them for the healthcare market is irrelevant. *See Bruce Church*, 109 Ariz. at 187 ("The recognized test is not whether a fruit or vegetable may be ready to eat at some given stage of the process, but the proper test is whether the process is incident to the preparation of the product for the market selected by the farmer.").  Second, the twelve-module operation involves a series of integrated actions that transform the healthcare textiles into a marketable form.  Accordingly, the machinery or equipment that touches, manipulates, affects, or adds value to the healthcare textiles during Angelica's cleaning process qualifies for the use tax exemption. *See Capitol Castings, Inc.*, 207 Ariz. at 451 ¶ 25.  The fact that Angelica's processing operation prepares its product for market rental rather than sale is irrelevant under the statute.

15

**E.**

**¶43**        Our definition of "processing operation" yields an analytical framework that is true to § 42-5159(B)(1)'s text and purpose. It limits the use tax exemption to the machinery and equipment used directly in an operation involving a series of integrated actions or methods that prepares a product for the market or converts a product into marketable form. And it refocuses the scope of the exemption inquiry on the processing operation rather than the entire business.

**¶44**        We acknowledge the Department's concern about the limits of our interpretation of § 42-5159(B)(1), including whether a restaurant or a neighborhood laundromat may be entitled to a use tax exemption as a processing operation. But our interpretation reflects the statute's inherent reach and scope, and our holding recognizing the use exemption for Angelica's federal and local-regulated, industrial medical textile laundering and disinfecting operation is limited to its facts. We leave for another day other businesses' eligibility for the statute's use tax exemption.

**CONCLUSION**

**¶45**        We vacate the court of appeals' decision, reverse the tax court's summary judgment ruling in favor of the Department, and remand to the tax court for further proceedings consistent with this Opinion.

**¶46**        We also deny Angelica's request for an award of attorney fees pursuant to A.R.S. § 12-348(B)(1) without prejudice to renewing its request when the case is resolved.